**HEYMAN MANUFACTURING COMPANY, Plaintiff,**

v.

**HAP CORPORATION, Defendant.**

Civ. A. No. 2207.

United States District Court
D. Rhode Island.
June 23, 1961.

---

Delavan Smith, New York City, John H. Chafee, Providence, R. I., of counsel, for plaintiff.

Max Schwartz, Providence, R. I., William R. Liberman, New York City, Walter Adler, Providence, R. I., of counsel, for defendant.

DAY, District Judge.

In this suit, as originally filed, plaintiff alleged infringement by the defendant of plaintiff's patent No. 2,476,738, issued July 19, 1949, to plaintiff as assignee of Ferdinand Klumpp, Jr. for the construction of a solderless blade for electrical plug caps. In its answer setting up the defenses of invalidity and non-infringement the defendant included a counterclaim alleging that plaintiff had infringed the claims of four letters patent belonging to it as the assignee of William P. Herman. These patents are (1) No. 2,191,384, issued February 20, 1940 for the construction of a contact plug, (2) No. 2,191,385, issued February 20, 1940, also for the construction of an electrical plug, (3) No. 2,198,966, issued April 30, 1940, for the construction of a connector plug assembly apparatus, and (4) No. 2,278,176, issued March 31, 1942, also for the construction of an apparatus for assembling of connector plugs.

After the filing of the defendant's answer and counterclaim, the plaintiff was granted leave to file, and did file, an amended complaint wherein it alleged that the defendant had also infringed its patent No. 2,558,052, issued to it on June 26, 1951, as the assignee of the said Klumpp, Jr. This patent related to a process for making solderless blades for electrical plug caps. In its answer to this amended complaint, the defendant also asserted that said patent was invalid for

want of invention and also denied infringement thereof.

Plaintiff in its answer to defendant's counterclaim denied the invalidity of each of the defendant's patents and, in the alternative, any infringement thereof. However, during the trial and in its brief, its defenses thereto were—"(1) The claims of the '384 and '385 patents in suit are invalid because William P. Herman is not the inventor thereof, (2) The claims of the '966 capping machine patent in suit are an invalid combination of features that are old in the prior art, (3) The claims of the '966 capping machine patent are invalid as Herman is not the inventor thereof, (4) Heyman does not infringe any claims of the '176 patent in suit."

The trial of this case consumed ten days and a great many exhibits, some of dubious value, were introduced in evidence. Counsel for the parties, after trial, filed voluminous original and reply briefs to which I have given long and serious study. To recite and discuss the many and diverse contentions advanced by the parties would serve no useful purpose and would unnecessarily prolong this opinion. In all candor, in some respects the evidence adduced left much to be desired in respect to its value.

As hereinbefore stated, the Klumpp patent '738 relates to the corporation of a solderless blade for an electrical plug cap. It contains two claims, both of which, the plaintiff contends have been infringed by the defendant. These claims read as follows:

"1. A solderless blade for an electrical plug cap comprising, a one piece strip of suitable material having its opposite ends bent over toward each other to form a two part slidable plug contact portion, one of said contact parts being longer than the other and terminating in a bent over end divided so as to receive an insulated electrical conductor therebetween, each division having a finger at its end initially extending at an acute angle inwardly toward the other as well as toward the conductor and adapted to be forced into the insulation of the conductor on opposite sides of a diameter thereof, the shorter of said two contact portions having means at its end for assisting in locating the blade in the plug cap, a pair of oppositely spaced lugs on the longer of said blade portions positioned adjacent said locating means, the lugs having their free edges formed diagonally in opposite directions so when they are bent over the bare conductor end, their edges will substantially meet and form a gripping closure around said conductor end.

"2. A solderless blade for an electrical plug cap comprising, a one piece strip of suitable metal having its opposite ends bent over toward each other to form a two part slidable plug contact portion, one of said contact parts extending beyond the other part and terminating in a bent over end projection before assembly with a conductor in a direction which will intercept a plane extending from the shorter of said two parts, this bent over end consisting of two portions spaced so as to receive the outer insulation of an electrical conductor therebetween, each of said spaced portions terminating in a finger projecting outwardly at an angle to the plane of said portion, said spaced portions being adapted to be forced downwardly and toward the plug contact portions while the said fingers are adapted to be simultaneously forced downwardly and inwardly toward each other into gripping position over the insulation of the conductor, said extending contact part, having cut-away sections on opposite sides adjacent the end of the other of said two plug contact portions, said cut-away sections forming lugs having their free edges cut on diagonals whereby when these lugs are forced over the bared end of the conductor they will substantially

meet and form a gripping enclosure around the conductor end."

The evidence establishes that prior to the introduction of contact blades made in accordance with the teachings of the '738 patent, the bulk of all contact blades made and sold were of solid construction about ⅟₁₆″ thick with holes to permit the conductor to be soldered to the blade. It is clear that the attachment of the conductor to that type of blade was time consuming and expensive, but was necessary to produce a secure bond between the contact blade and the conductor. In addition, when solder was used to secure the conductor to the blade, there was a tendency for the solder through capillary action to be drawn up into the conductor, causing it to stiffen and to become difficult to handle in assembly operations.

The testimony further establishes that the difficulties incident to the use of soldered blades limited the assembling of cord sets by one operator to between 200 and 300 per hour. After the introduction of said solderless, crimped blade, made in accordance with said '738 patent, the number of cord sets assembled by one operator using such blades increased to an average of 2,000 per hour. Moreover, it is clear that the solderless blades produced prior thereto had insecure and unsatisfactory conductor and insulation grippings. That said solderless blade met with substantial and continued commercial success is established beyond doubt.

In its attempt to establish its defense that said patent is invalid over the prior art, the defendant has cited 13 prior patents in addition to those cited by the examiner. I have considered all of these and find no basis for concluding that the improvements claimed in said patent '738 were described and set forth in those prior patents, or in any prior publications, or that the invention described therein was devoid of substantial novelty in the view of the prior art. In short, I find and conclude that said patent '738 is valid.

Defendant's further contention that said patent describes an inoperative disclosure, in my opinion, requires no discussion. The credible evidence satisfies me that the plaintiff's blades are made in accordance with the disclosures of said patent.

It further appears that the defendant, in late 1951, after several attempts to produce a satisfactory solderless contact blade, began to manufacture and sell a crimped blade indistinguishable from the patented product. That the defendant appreciated this is shown by its admitted use in its sales catalogue, describing its products, of a copy of a drawing of the plaintiff's used by the latter in advertising its blades. The conclusion is inescapable that the defendant has deliberately infringed the plaintiff's patent '738, and I find specifically that its blades, Nos. 3 MB–2, 3 B, 3 MB, 3MBS–2, 3 MAS and 3 MBS–1 infringed said patent.

Originally, plaintiff contended that the defendant, in the manufacture of its solderless blade P.P.E., infringed claims 1, 2, 3, 4 and 6 of its '052 patent. During the trial it relied solely on alleged infringements of claims 4 and 6, and withdrew any and all claims of alleged infringements of claims 1, 2, and 3. Patent '052 relates to the process of making solderless contact blades from a strip of suitable metal fed in and through a progressive die. Defendant concedes that its P.P.E. blade is made from a single strip of metal, fed in and through a progressive die.

The evidence discloses that the application of said patent '052, after substantial amendments to its claims, was finally allowed by the Board of Appeals which reviewed the conclusions of the Examiner.

Claims 4 and 6 of this patent read as follows:

"4. The process of making solderless blades for electrical plug caps which consists in passing a strip of suitable metal through a punch press, punching four rows of holes longitudinally of the strip, two rows being near one edge and spaced apart but a short distance but in trans-

verse alignment, the other rows being toward the opposite edge of the strip and in transverse lines midway between the transverse alignments of the holes near said one edge, shearing off the metal diagonally, starting from the edge of the strip, at a point so the major part of the shear will be below the hole, each shear extending to its hole in the row nearest the edge and to the lower part of the hole farthest away from the starting point of the diagonal and at the same time shearing off on a diagonal, the metal from an upper corner of this edge positioned hole to the hole in alignment in the inner row, at the same time transversely shearing off the metal from the hole in the inner row to the opposite edge of the strip passing midway between two pair of holes located toward said opposite edge, except for a small retaining lug, and then bending over a positioning ledge at the free sheared edge, then bending over the sheared end having the ledge with the bend coming midway between the second mentioned rows of holes until it engages the metal adjacent the inner holes of the edge rows, then forming up the metal portion defined by said diagonal shearing to provide fingers to receive the bared end of a conductor and the insulation of the conductor."

"6. The process of making solderless blades for electrical plug caps as set forth in claim 4 further defined in that the process includes forming at least two of the blades simultaneously."

In this patent the objects of the invention are stated to be not only to make a blade like that covered by patent '738, for secure gripping of the conductor and the insulation of the conductor, "but to accomplish these objects in a cheaper manner by using less material to offset increasing cost thereof, and processing the same in a new and improved manner to offset at least in part higher labor costs."

Claims 4 and 6 were originally denied by the examiner for want of novelty over prior art. On appeal, the Board of Appeals, in reversing the examiner and allowing said claims said:

"The claims on appeal define a sequence of detailed punching and shearing steps resulting in the production of contact blades in a manner stated to be cheaper because less material is used and the Examiner is of the opinion that the claimed process is lacking in invention over the references. * * * We think there is a relationship between the claimed punching and diagonal shearing steps and the transverse shearing of the strip, serving to delimit the blade that is not disclosed in the references and we are of the opinion that practice of the claimed method would result in the advantages that have been attributed to it. * * * "

Plaintiff offered no testimony by an eyewitness as to the method or process employed by the defendant in the manufacture of its P.P.E. blade. To support its claim of infringement it relied upon the testimony of an expert who undertook to describe the steps in its manufacture from an examination of a strip of completed blades and a development strip of such P.P.E. blades showing the production of the blade from the original metal strip.

Without summarizing his testimony, it is fair to say that at best it was conjectural. In opposition thereto the defendant produced a witness who had observed the actual production of defendant's blade. From a consideration of this conflicting testimony I am satisfied that the process employed by the defendant is substantially dissimilar from that covered by the patent. Plaintiff's process employs five separate steps, one of which is punching for metal removal and a second of which is shearing four separate and distinct lines for metal separation, with the remaining steps involving bending and forming operations. Defendant's process, on the other hand, involves

nine separate steps, the first, second, third, fourth and sixth steps, involving punching, with a considerable amount of metal being removed from the metal strip thereby; the fifth step involving a single shear line, and the remaining steps involving bending and forming operations. In addition to the dissimilarity of the steps employed and the sequence in which they occur, the blade produced by the defendant's process is different from that covered by said patent. The method covered by the patent involved the formation of blades which closely adjoin one another and which are separable by slight pressure by one's fingers for the purpose of assembly in a cord set, and relatively little scrap or waste of metal is produced in their manufacture. On the other hand, the defendant's blades, in their manufacture, are spaced substantially apart and are connected by a bridge bar which must be severed in a separate operation and considerable scrap results from the five punching operations employed in their construction.

Plaintiff concedes that I must find that punching and shearing are equivalent operations if said claims 4 and 6 are to be found to be infringed by the method employed by defendant in its production of said P.P.E. blade. I am unable to so conclude. In my judgment, as used in said patent, "shear" means merely metal separation along a line, without any appreciable scrap resulting therefrom, while "punch" means an area of metal removal with considerable scrap being produced thereby. Having in mind the crowded state of the art when said patent '052 was allowed on appeal, and the obvious weight given by the Board of Appeal to the claimed savings in material to be effected by the asserted invention of the applicant, I am unwilling to conclude that "shearing" and "punching" are equivalents.

Plaintiff concedes that said patent did not cover spaced blades with scrap formation between the contact portions of the blade, as is present in the P.P.E.

blade. Defendant's blade is clearly such a blade.

■ Since defendant's process does not perform substantially the same function as that covered by said patent in the same way to obtain the same result, it cannot be said that defendant's process infringes said patent. Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 1950, 339 U.S. 605, 70 S.Ct. 854, 94 L. Ed. 1097; Holtzer-Cabot Electric Co. v. Standard Electric Time Co., 1 Cir., 1940, 111 F.2d 71.

■ Patents '384 and '385, as hereinbefore stated, relate to the construction of electrical contact plugs. They were issued the same day with consecutive numbers. They differ only in that the contact blades could be inserted from either end of the plug in patent '384, and from only one end in patent '385. Defendant contends that plaintiff's plugs, defendant's exhibits XX and YY, infringe these patents. It is conceded by the plaintiff that said accused items were made and sold by it within the six-year period prior to the expiration of said patents. Plaintiff offered no evidence on the issue of its infringement thereof.

I am satisfied by the evidence and conclude that patent '384 was infringed by plaintiff's structure, defendant's exhibit XX, and that its structure, defendant's exhibit YY, infringed said patent '385.

The sole issue with respect to these patents is—was the said Herman the inventor of the inventions covered by said patents. The plaintiff has endeavored to show that one Arthur Brownstein, an employee for about three months in 1935, of the corporation of which Herman was then the president, was in fact the inventor. The evidence shows that Brownstein left his employment after a disagreement with Herman. About two years later Brownstein apparently instigated by others filed an application for a patent on a resilient rubber electric plug which covered substantially the same ideas and structures set forth in appli-

cations for letters patent previously filed by Herman in May, 1935 and in April, 1936. In 1939, the defendant (then called Electrix Corporation) sued Brownstein in the United States District Court for the District of Connecticut for cancellation of his application which had become involved in an interference proceeding with said Herman applications. It appears that this suit was settled in the same year for the sum of $2,700 upon the relinquishment by Brownstein of any and all claims to the inventions claimed by Herman in his applications. Thereafter, said patents '384 and '385 were issued to Herman. Brownstein testified in support of plaintiff's contention that he, not Herman, was the inventor of said contact plugs covered by said patents. Frankly, I was far from impressed by his testimony and I am not satisfied that he was the inventor of said structures. Similarly, I was not convinced by the testimony of the witness, Carl H. Judisch, who was a fellow employee of Brownstein for said period of about three months in 1935, and who endeavored to corroborate the testimony of Brownstein as to certain events claimed to have occurred more than twenty-five years prior to the trial of this case.

■ The situation presented is governed by the rule of law that when a person charged with infringement of a patent seeks to establish anticipation by means of oral testimony he must do so by proof that leaves no reasonable doubt as to the fact. This rule of law is clearly stated in The Barbed Wire Patent (Washburn & Moen Mfg. Co. v. Beat 'Em All Barbed Wire Co.) 1892, 143 U.S. 275, at page 284, 12 S.Ct. 443, 447, 36 L.Ed. 154, where the Supreme Court said:

"* * * Witnesses whose memories are prodded by the eagerness of interested parties to elicit testimony favorable to themselves are not usually to be depended upon for accurate information. The very fact, which courts as well as the public have not failed to recognize, that almost every important patent, from the cotton gin of Whitney to the one under consideration, has been attacked by the testimony of witnesses who imagined they had made similar discoveries long before the patentee had claimed to have invented his device, has tended to throw a certain amount of discredit upon all that class of evidence, and to demand that it be subjected to the closest scrutiny. Indeed, the frequency with which testimony is tortured, or fabricated outright, to build up the defense of a prior use of the thing patented, goes far to justify the popular impression that the inventor may be treated as the lawful prey of the infringer. The doctrine was laid down by this court in Coffin v. Ogden, 18 Wall. 120, 124 [21 L.Ed. 821], that 'the burden of proof rests upon him, [the defendant,] and every reasonable doubt should be resolved against him. * * *' This case was subsequently cited with approval in Cantrell v. Wallick, 117 U.S. 689, 696 [6 S.Ct. 970, 29 L.Ed. 1017], and its principle has been repeatedly acted upon in the different circuits * * *."

See also, Cold Metal Products Company v. E. W. Bliss Company, 6 Cir., 1960, 285 F.2d 244; Western States Mach. Co. v. Ferguson, D.C.R.I.1931, 47 F.2d 775.

■ In my opinion, the testimony that Brownstein invented the devices covered by said patents is far from clear and convincing, and falls far short of being adequate proof to overcome the presumption of the validity of said patents.

Similarly, the plaintiff contends that said '966 patent is invalid because of want of invention and secondly, because if the method constituted invention, that the said Judisch and not Herman, was the discoverer thereof. In support of the first of these contentions the plaintiff cites two prior art patents, viz., Brown, U.S. Patent No. 2,097,057, filed June 15, 1932 and issued October 26, 1937, and Turner, U.S. Patent No. 2,163,716, filed January 26, 1935 and issued June 27, 1939.

The broad idea that electric caps must have the ends thereof spread open to permit entry of the blade-conductor assembly is clearly disclosed by the Brown patent. Its specifications provide as follows:

"After the wires of the cable 3 have been attached to the terminals 6 and 7 as just described and as shown in Figure 3, they are adapted to be inserted in the plug 1. This is done by means of a suitable expanding tool which is adapted to be inserted into the hole 2 and operated to expand the upper end of the plug so that the cable 3 with the terminals 6 and 7 may be inserted therethrough. The terminals 6 and 7 are guided into their respective channels 4 and 5 by another cooperating tool, and the lugs 8 will be located in their seats 9. When the said tools are removed from the plug, the terminals will be securely gripped in the channels 4 and 5 and seats 9, so that the complete assembly is substantially as illustrated in Figure 1." Page 1, lines 5–21.

The patentee claims the electric contact plug covered thereby to be an article so constructed and to have such properties as to permit the carrying out of the methods of assembly described in claims 5, 6 and 7 of said patent. Claims 1 to 4 relate to the plug. Typical of these claims is claim 3 which reads as follows:

"3. An integral resilient plug body having a plurality of parallel openings extending into the body in one direction and adapted to receive contact prongs, a single opening extending into the body in opposition to said first direction and communicating with all said parallel openings, the walls of said single opening extending in said first direction but a short distance from the adjacent ends of said spaced openings and adapted to be stretched to permit direct insertion of contact prongs into said spaced openings."

Claim 6 is typical of the assembly method claims. It reads as follows:

"6. The method of locating a pair of spaced contact pins in a plug body of resilient material having a central axial opening at its inner end and two spaced axially-extending openings at its outer end connected with the axial opening, which includes the steps of forcing the walls of said axial opening at the inner end of the plug apart a distance greater than the distance between the two spaced axially-extending openings, moving the spaced contact pins simultaneously in a straight line movement through the distended central axial opening into the plug body to proper axial positions relatively to the plug body and then permitting the forced-apart walls to approach each other to substantially normal position."

■ While it is true that Brown does not include any drawing of the suitable expanding tool referred to in the specifications, or of the method of inserting or removing it, it would seem to be well within the range of any routine machine designer to devise a tool for carrying out such disclosure, and the development of such a mechanism would not amount to invention. Saranac Automatic Machine Corporation v. Wirebounds Patents Company, 1932, 282 U.S. 704.

■ Moreover, a practical scheme for carrying out the disclosure of Brown is taught by the Turner patent which appears to have been overlooked by the examiner, for it is nowhere cited in the file of said '966 patent. In my opinion, the defendant's characterization of Turner as "Rube Goldberg" is unwarranted and cannot serve to minimize the teachings of that patent. While it may be conceded that defendant's method has practical advantages over the prior art, it cannot be said that the improvements made by Herman rise to the dignity of invention. I conclude, therefore, that said patent '966 was invalid for want of invention.

My conclusion in this regard makes it unnecessary for me to discuss in detail

plaintiff's further contention that said Herman was not the inventor of the method covered by said patent. Without reviewing the evidence directed to this contention. I find that the testimony offered to show that Judisch was the inventor of said alleged discovery falls far short of the quality and quantum of proof required in such a case. The Barbed Wire Patent, supra; Cold Metals Products Company v. E. W. Bliss Company, supra; Western States Mach. Co. v. Ferguson, supra.

As orginally filed, the application which resulted in the issuance of said patent '176 contained 31 claims. Eventually said application was granted as to 4 claims only. Each of these claims recites that certain "lock pins" are employed to hold the neck spreading mechanism open while the blade conductor assembly is drawn through the electrical cap.

For example, claim 1 recites as its final element:

"* * * and lock pins slidably mounted on said base and adapted to enter openings in said blocks when said blocks are in separated positions for locking said fingers in distending position during the movement of said carriage."

It is undisputed that the plaintiff's accused machine employs no lock pins. The evidence clearly establishes that the lock pins perform important and specific functions in defendant's machine and that a different cam action is employed in the accused machine.

■ Where claims are limited in the patent office following cancellation or rejection, as in this instance, the terms of limitation are controlling. Schriber-Schroth Co. v. Cleveland Trust Co., 1940, 311 U.S. 211, 61 S.Ct. 235, 85 L.Ed. 132; Weber Electric Co. v. E. H. Freeman Electric Co., 1921, 256 U.S. 668, 41 S.Ct. 600, 65 L.Ed. 1162.

In Schriber-Schroth Co. v. Cleveland Trust Co., supra, the Supreme Court held in 311 U.S. at page 220, 61 S.Ct. at page 239:

"It is a rule of patent construction consistently observed that a claim in a patent as allowed must be read and interpreted with reference to claims that have been cancelled or rejected, and the claims allowed cannot by construction be read to cover what was thus eliminated from the patent. (citations omitted). The patentee may not, by resort to the doctrine of equivalents, give to an allowed claim a scope which it might have had without the amendments, the cancellation of which amounts to a disclaimer."

The accused machine and that covered by the '176 patent are completely different in design. As noted by the examiner who rejected all the claims of the Herman application, original and amended, Brown and Turner had both earlier taught the idea of spreading open the electrical cap and pulling the blade-conductor assembly into the cap from the face thereof. The only contribution of the '176 patent is the teaching that the spreading mechanism employed to distend the cap may be kept open during the pulling operation by means of said lock pins.

■ In view of the prior art and the cancellation and rejection of the claims originally filed, I believe that the patent should be construed as limited to a machine employing lock pins to keep the spreading mechanism open during the pulling operation, and ought not to be given any broader interpretation. Schriber-Schroth Co. v. Cleveland Trust Co., supra. I find and conclude that plaintiff's machine does not infringe said '176 patent.

In summary, I find and conclude that defendant's blades, Nos. 3 MB–2, 3B, 3 MB, 3MBS–2, 3MAS and 3MBS–1 infringe the plaintiff's patent No. 2,476,-738, and that the plaintiff is entitled to a permanent injunction against further infringement by the defendant and an accounting for profits and damages; that defendant's patents Nos. 2,191,384 and 2,191,385 were valid, that plaintiff's products, defendant's exhibits XX and YY infringed them and that the defendant is entitled to an accounting for profits and damages; that defendant's patent No. 2,-

198,966 was invalid for want of invention over the prior art and that plaintiff has not infringed defendant's patent No. 2,-278,176.

The parties will prepare and submit a decree in accordance with the foregoing findings and conclusions.